# CHARLESTON.

## HULL, ADMX. v. VIRGINIAN RAILWAY CO. .

Submitted March 7, 1916.   Decided March 21, 1916.

1. MASTER AND SERVANT—*Injury to Brakeman—Proof of Negligence
—Rear-End Collision.*

   In an action, under the Federal Employers Liability Act, for the
negligent killing of a brakeman, the happening of a rear-end col-
lision between a train standing on the main track and one in mo-
tion, on a dark and foggy night, is not of itself sufficient to prove
negligence on the part of the engineer of the moving train, al-
though he knew another train was ahead of him, but did not know
it had stopped, when the undisputed testimony of witnesses show
he was running not over twelve or fifteen miles an hour, and was
keeping a careful lookout and was not signalled to stop, and did
not see the lights on the rear end of the standing train, on account
of a short curve and the darkness and fogginess of the night, until
he was so close as to make it impossible to stop his engine in time
to avoid the collision, he having a right, under the rules of defend-
ant company, to expect a signal in time to stop, in case the fore-
most train should stop on the main line.   (p. 28).

2. SAME—*Rear-End Collision—Duty of Engineer.*

   It being the duty of the rear brakeman, under the rules of the
company, when his train stops and is liable to be overtaken by
another train, to go back along the track and protect it by cer-
tain signals, to be given or placed on the track, and the duty also
of the conductor to see that he does so, when the train makes a reg-
ular stop, known to the conductor, the engineer is not required to
signal the flagman to protect the train, in the absence of a rule or
established custom among the trainmen requiring him to do so in
such case.   (p. 28).

3. SAME—*Injury to Servant—Proof of Negligence.*

   Under the Federal Employers Liability Act a carrier's liability
depends on negligence, and the evidence must establish actionable
negligence, with reasonable certainty, before there can be a recov-
ery.   Negligence will not be inferred from proof of facts and cir-
cumstances which are just as consistent with due diligence as with
some theory of negligence.   (p. 28).

4. SAME—*Death of Railroad Employe—Contributory Negligence—
Accident.*

   There is no liability on a railroad company for the death of an
employe, caused wholly by his own negligence, or by mere acci-
dent.   (p. 28).

5. SAME—*Railroad Employes—Duty of Company.*

A railroad company is not bound to provide walk-ways or guard-rails on its bridges and trestles for the protection of its employes. (p. 32).

6. SAME—*Injury to Railroad Employe—Assumption of Risk.*

The doctrine of assumption of risk is not wholly abolished by the Federal Employers Liability Act. An employe of a railroad company, engaged in interstate commerce, assumes the ordinary hazards of the business in which he engages, not arising out of the company's negligence or the negligence of its officers or other employes. (p. 33).

7. SAME—*Railroad Employes—Provisions for Safety—Duty of Company.*

The standard of care required of a railroad company in the construction and maintenance of its road, bridges and trestles, is such reasonable care and skill as is ordinarily employed in that respect by railroad companies in general. (p. 33).

Error to Circuit Court, Mercer County.

Action by Maude Hull, administratrix, etc., against the Virginian Railway Company. Judgment for plaintiff, and defendant brings error.

*Reversed, and judgment for defendant.*

*McNutt, Ellett & McNutt, Sanders, Crockett & Kee, Brown, Jackson & Knight* and *G. A. Wingfield,* for plaintiff in error.

*W. R. Bennett* and *J. G. Challice,* for defendant in error.

WILLIAMS, PRESIDENT:

Plaintiff, as administratrix of her deceased husband, brought this action under the Federal Employers Liability Act against the Virginian Railway Company to recover damages for his death, caused by its alleged negligence. The accident out of which this suit grew is the same as in the case of *Culp's Adm'x.* v. *Virginian Railway Co.,* 77 W. Va. 125, 87 S. E. 187. The evidence in the two cases is very similar, and the principles of law applied there govern our decision here. Defendant is an interstate carrier and deceased, at the time of his death, was a brakeman employed on one of its trains engaged in interstate traffic. About four o'clock

on the morning of September 1, 1912, a rear-end collision occurred at Hotchkiss station, between two special trains moving westward with empty cars for distribution to coal mines located along the main line of railroad. Both trains had taken the siding at a station called Maben, 3.7 miles east of Hotchkiss, pursuant to the train dispatcher's orders, to await the passing of an east bound train. After that train had passed, the foremost west bound train, designated as No. 455, pulled onto the main track and moved on westward, and in five or six minutes thereafter, according to the judgment of plaintiff's witnesses, the rear train, known as No. 500, followed it. Both were special trains, the movements of which are regulated by the dispatcher's orders, and not by regular schedule. The destination of No. 455 was Eccles, a station some distance west of Hotchkiss, but it had to drop some of its cars at Hotchkiss. This required it to stop and shift them into the proper place on the siding. When Mr. Spotts, the engineer, came to the switch at Hotchkiss he stopped his train, as was his custom when he carried cars to be dropped at that place, to allow the front brakeman to get off the engine, uncouple the cars and open the switch. When the train stopped the caboose was standing near the middle of a trestle or bridge, 184 feet long and 35 feet high. While the engineer and some of the crew were engaged in shifting onto a spur track the cars to be dropped and watering the engine, No. 500 crashed into the caboose, and shoved it forward off the bridge, demolishing it and overturning three or four cars. According to the testimony of all the witnesses who give any estimate of the time, it was fifteen minutes between the stopping of No. 455 and the happening of the accident. Deceased was the rear brakeman and Harry Culp was conductor of No. 455. According to the undisputed testimony of witness W. E. Davis, who was a brakeman on the train and who says he was in the caboose with Hull and Culp, and, therefore, the last man to see either of them alive, Culp was in the cupola and Hull was standing on the floor of the caboose, just after the train had stopped. Witness then got out of the caboose and went forward to assist in the work of shifting cars.

No. 500 had no orders to stop at Hotchkiss, and was running at the rate of twelve or fifteen miles an hour when it collided with No. 455. Signal lights were on the rear of the caboose, but it is proven they were not seen, and, on account of the darkness and fog, as well as because of a short curve in the track, just east of the bridge, could not have been seen in time to enable the engineer to stop before striking the caboose.

The acts of negligence averred are: (1) failure of the engine crew of No. 500 to observe the markers or lights on the caboose; (2) their violation of Rule 91, which forbade their following No. 455 in less time than ten minutes after it left Maben; (3) not providing a walk-way and guard-rails on the bridge, for the protection of trainmen; and (4) failure of the engineer on No. 455 to signal to the rear·flagman to protect the rear of his train.

At the conclusion of plaintiff's testimony, on motion of defendant, the court directed the jury to return a verdict for it, which they accordingly did. The plaintiff then moved ·the court to set it aside and grant her a new trial for alleged errors committed during the trial, and the court took the motion under advisement, and at a later term sustained it, and set aside the verdict and awarded plaintiff a new trial. It is to that order this writ of error was awarded. Newly discovered evidence is not involved, and if there is no evidence on which the jury could have found defendant, or any of its officers or servants, guilty of negligence causing the death of plaintiff's intestate, the court did not err in directing a verdict to be returned for it, but did err in thereafter setting it aside and granting a new trial.

The right of recovery under the Federal Employers Liability Act depends upon negligence for which the carrier is made liable, and if deceased's death was the result of a mere accident, or was due solely to his own negligence, there can be no recovery. *Culp's Admx.* v. *Virginian Ry. Co., supra;* and *Easter* v. *Virginian Ry. Co.,* 76 W. Va. 383, 86 S. E. 37.

The collision itself might seem to prove negligence on the part of some one or more of defendant's servants, who were in charge of one or the other of the colliding trains. But the

circumstances do not definitely prove actionable negligence. The accident may have been due wholly to the negligence of deceased; or it may have been a pure accident, as we will endeavor to show a little later.

It is insisted that J. B. Thomas, engineer on No. 500, was negligent in not seeing the rear lights on the caboose of train No. 455, and in not slacking his speed when he approached Hotchkiss, so as to be able to stop his train in a short distance, in case the emergency arose. The engine crew, according to the proof, were keeping as careful a lookout ahead as they could, consistently with their other duties of operating the train, and did not see the light on the caboose. The engineer says he could not see it and did not see it "until he was right at it." We have already mentioned his explanation for not being able to see it. The undisputed testimony further proves the lights could not have been seen, on that dark and foggy night, along a straight track, more than four or five car lengths away. And that was too short a distance to have stopped the heavy engine and train of thirty-seven cars, running twelve or fifteen miles an hour. Although the engineer knew another train was ahead of him, and may have known it would drop some cars at Slab Fork mine, not at Hochkiss but beyond it, on a spur track, still, under the rules of the company, he had no cause to suspect it would be occupying the main line, without sending back a flagman to give him warning. He says his train was not scheduled to stop at Hochkiss and twelve to fifteen miles an hour was not unusual speed. Deceased was rear brakeman on No. 455, and it was his duty to protect the rear of his train, when it became necessary to do so, by going back a reasonable distance along the track and giving to the approaching train a stop signal. Rule 99 was introduced in evidence, and is as follows: "When a train stops or is delayed under circumstances under which it may be overtaken by another train, the flagman must go back immediately with stop signals a sufficient distance to insure full protection. When recalled, he may return to his train, first placing two torpedoes on the rail when conditions require it. The front of the train must be protected in the same way, when necessary, by the fireman."

But counsel for plaintiff insists that rule 105 was applicable, under the circumstances of the case, and the failure of the engineer on No. 455 to signal the rear brakeman, when he stopped his train, to go back and flag the oncoming train, was negligence. That rule provides: "Both conductors and enginemen are responsible for the safety of their trains, and under conditions not provided for by the rules must take every precaution for their protection." This is a rule of general application, and is not intended to take the place of particular and definite rules covering specific cases. Here train No. 455 stopped at a place where it was liable to be overtaken, almost any minute, by another train, which the conductor and rear brakeman, as well as the engineer, knew was following them. The engineer says he was not required, under the circumstances, by any rule of the defendant company, to signal to the flagman, because it was known to the whole crew that the stop would be made at Hotchkiss; and that an engineer is required by the rules to sound such signal, only when his engine is disabled, or is stopped for some cause unknown to the conductor. The conductor controls the movements of his train, and, in the case of special trains, informs the engineer where to stop. Mr. Spotts says he had been employed, as engineer, on defendant's road for about four years; that he had been running engine No. 455 on the special run, known as the "night Eccles mine run," for about fifteen days; that it was the practice to stop and switch cars at Hotchkiss, just as they were doing on the night of the accident; and that "the whole crew, when they arrived at Hotchkiss, had an understanding what was going on. As a general thing it was a regular piece of work, and it was unnecessary" to signal to the flagman to protect the rear of the train. No rule was proven, which required him to sound a signal when he made a regular stop. But another rule, under the caption of "Instructions to Conductors," was put in evidence, and is as follows: "Invariably require flagman to act with the utmost promptness, in strict accordance with the rules, and never intrust such responsible duties to an inexperienced man, unless in case of absolute necessity, when he must be given the fullest instructions that the nature of the

emergency will permit.'' This rule made it the duty of Mr.
Culp, conductor on No. 455, to see 'that deceased, who was the
rear brakeman and flagman, performed his duty by flagging
the oncoming train; and rule No. 99, above, required de-
ceased to perform that duty, whether ordered to do so by the
conductor or not. That the train was not protected is undis-
puted, but why it was not protected no living witness has
attempted to explain. Conductor Culp and rear brakeman
Hull were both killed, and no one living can tell which one,
if either of them, failed to discharge his duty. The circum-
stances attending their death do not indicate, with any
degree of certainty, that either of them was negligent. They
were both last seen alive in the caboose, just after the train
had stopped, by witness Davis who was riding in the caboose
with them, and who left it and went forward to the engine.
The caboose was standing about the middle of a trestle, 35
feet high and 184 feet long, at the time No. 500 crashed into
it, and it was driven forward by the momentum of the col-
liding engine to the west side of the trestle, a distance of
eighty or ninety feet, and was broken to pieces, and a num-
ber of the cars were toppled over. Culp's body was found
beneath some of the debris of the caboose, about eighty feet
from the track, over the embankment, very much mangled.
It is, therefore, reasonably certain that he was in the caboose
at the time of the collision and was killed by the impact of
the engine. Hull's body was found on the rocks in the edge
of the stream, at a point, as near as the witness could tell,
almost directly under the place on the trestle where the
caboose had been standing, and was not cut or mangled, but
both legs and, some of the witnesses think, also one arm, were
broken. From these circumstances the reasonable inference
is, he was not in the caboose when the collision occurred.
But it is uncertain whether he was knocked off the trestle by
the oncoming engine, or attempted to alight from the caboose,
when his own train stopped, or later, and lost his footing and
fell to the rocks below. Either theory is equally consistent
with the facts and circumstances proven. If the first theory
is correct, then his death is attributable solely to his own
negligence, and the defendant is not liable; for he had ample

time, after his train had stopped, to alight from the caboose and pass over the trestle to a safe point beyond it, before No. 500 could have come upon him. The undisputed evidence is that his train had been stopped and was standing for about fifteen minutes before the collision. But if the latter theory is the true one, then his death is the result of an unfortunate accident for which the law holds no one responsible. Plaintiff must prove negligence to entitle her to recover, and it is not enough to prove a state of "facts and circumstances, which are equally consistent with one or more theories, when defendant is liable only in case a certain one of them is the true one. The evidence must point out, with a reasonable degree of certainty, that the death of plaintiff's intestate was directly due, either in whole or in part, to the negligence of someone or more of defendant's servants other than himself. It does not do so. So far as the proof shows Hull's death may have been the result of accident, or it may have been caused wholly by his own negligence. It is not enough to show that defendant may have been guilty of negligence; the evidence must show that it was actually guilty. *Patton* v. *Tex. & Pac. Ry. Co.*, 179 U. S. 658; *Smith* v. *Illinois Central R. Co.*, 200 Fed. Rep. 553; and *Culp, Admx.* v. *Virginian Ry. Co.*, 77 W. Va. 125, 87 S. E. 187.

It is proven there was not room on the trestle for a man to walk by the side of a moving train, without danger of being knocked off, and the failure to provide a walk-way or guard-rail on the trestle is alleged as negligence. The trestle is constructed like all the many others on defendant's railroad, leading through the mountainous region of West Virginia, and after the fashion of most other railroad bridges in this country. Deceased had been a rear brakeman on this special train making night runs on a number of previous trips, and it is proven the stop at Hotchkiss was one of the customary stops on this run; that, when the train would stop, the position of the caboose, with reference to the trestle, depended on the length of the train, as well as on the distance from the switch the engineer would stop his engine. The latter distance depended also on the number of cars, in the train, to be placed on the spur track at that place, the more

cars to be placed, the farther the engineer would stop his engine from the switch, in order to run around and shift them. It is proven there is plenty of room for a brakeman to get off the caboose, when it is standing on the trestle, and go back and perform his duty as flagman. Witness Davis, a brakeman, says he had no difficulty in discovering the caboose was on a trestle, when he left it to go forward. Hull had been rear brakeman on this special night run to Eccles, which is a point west of Hotchkiss, for at least fifteen days, and he had opportunity to know the character of the road, and the width of its trestles. He had been a brakeman on other trains on the road for two years. He was the ranking brakeman of the crew on this night run. He must, therefore, have assumed the risk of the ordinary hazards of a brakeman, not due to the negligence of some other employe of defendant company. The master is not obliged to furnish his servant an absolutely safe place to work, or appliances with which to work. Operating trains upon a railroad, however carefully the track may be constructed, is attended with a great deal of danger, and the servant, employed in that business, necessarily assumes such risks as are ordinarily incident thereto, except that, under the Federal Employers Liability Act, he does not assume risk of injury from the negligence of a fellow servant or other employe of the carrier. The standard of care required of a railroad company in constructing its road and bridges is such reasonable care as is ordinarily used by railroads generally, in that respect. *Seldomridge* v. *C. & O. Ry. Co.,* 46 W. Va. 569; *Soward* v. *American Car Co.,* 66 W. Va. 266; *Giebell* v. *Collins Co.,* 54 W. Va. 518; and *Washington & Georgetown R. Co.* v. *McDade,* 135 U. S. 554. The common law doctrine of assumption of risk is not wholly abolished by the Federal Employers Liability Act. That rule still applies, except where the servant's injury results from the negligence of the carrier to observe some positive duty enjoined upon it by statute, or results from some other act of negligence of its own, or of its officers or servants. In all other respects the doctrine of assumption of risk applies as at the common law. *Seaboard Air Line Ry. Co.* v. *Horton,* 233 U. S. 492; *Gila Valley G. &*

*N. R. Co.* v. *Hall,* 232 U. S. 94, 58 L. Ed. 52; Roberts' Injuries to Interstate Employees, sec. 98. Deceased must have contemplated that it might become necessary for him to alight from the caboose upon a high trestle, of which the evidence shows there were many along the line of defendant's road, on a dark night, for the purpose of performing his duty as flagman, and hence it is one of the ordinary risks which he assumed. To establish a rule, which we are asked to do, requiring railroad companies to provide walk-ways and guard rails along bridges and trestles, for the protection of their employes, would be to assume a jurisdiction which does not belong to the courts. That is a matter with which the Legislature alone can properly deal.

The proof fails to show actionable negligence, and the order of the court setting aside the verdict and granting plaintiff a new trial will be reversed, and a judgment of *nil capiat* entered here.

*Reversed, and judgment for defendant.*