## DAVIS, Agent, v. SHIRER.

(Circuit Court of Appeals, Fourth Circuit.  April 13, 1923.)

No. 2026.

1. **Appeal and error ⬅️1170(5)—Denial of directed verdict for variance in not alleging facts under Employers' Liability Act not substantial error, where no surprise.**

Where the complaint for wrongful death states facts that do not disclose that the case is within the federal Employers' Liability Act (Comp. St. §§ 8657–8665), but the defendant in its answer alleged that the case came under the federal law, and was therefore not surprised by a variance between the allegation and the proof, no substantial harm requiring a reversal resulted to defendant under Judicial Code, § 269, as amended by Act Feb. 26, 1919 (Comp. St. Ann. Supp. 1919, § 1246).

2. **Master and servant ⬅️112(6)—Railroad held not negligent in maintaining trestle.**

Where a flagman was killed by falling from a filled trestle 15 feet wide while attempting to board his train, *held*, that his employer was not liable, as no standard of reasonable care requires a railroad to construct its trestles, so that they can under all conditions be safely used by pedestrians when a train is standing on them or moving over them.

3. **Master and servant ⬅️137(2)—Railroad held not negligent in management of train.**

Where a passenger train flagman was killed by falling from a trestle while attempting to board the last car of his train, moved with a jerk, in consequence of which he lost his hold, *held*, that the employer was not chargeable with negligence in the management of the train; it appearing that only one of the passengers standing lost his balance in consequence of the jerk, and that deceased was not in a place where a rule required him to be for the safety of his train, which was delayed on the trestle.

Waddill, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of South Carolina, at Florence; Henry A. Middleton Smith, Judge.

Action at law by Annie C. Shirer, as administratrix of the estate of T. Drayton Shirer, deceased, against James C. Davis, as agent. Judgment for plaintiff, and defendant brings error. Reversed.

Nath. B. Barnwell, of Charleston, S. C. (Whaley, Barnwell & Grimball, of Charleston, S. C., on the brief), for plaintiff in error.

John I. Cosgrove, of Charleston, S. C. (Logan & Grace, of Charleston, S. C., on the brief), for defendant in error.

Before WOODS and WADDILL, Circuit Judges, and ROSE, then District Judge.

ROSE, Circuit Judge.  The parties will be here referred to as they were below, where the defendant in error was the plaintiff and the plaintiff in error the defendant.

[1] The plaintiff's decedent, a man of 48 at the time of his death, had been for 35 years in the employ of the Southern Railway, the last 25 of them as flagman.  He met his death shortly before the railroads were returned to their owners, so that the suit was necessarily

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

brought against the defendant as successor to the Director General of Railroads. Both parties agree that the facts bring the case under the federal Employers' Liability Act (Comp. St. §§ 8657–8665), although the plaintiff's complaint did not disclose that fact, and apparently was drawn as if the cause of action arose under the laws of South Carolina. The defendant asked for a directed verdict on the ground of a variance in this respect between the allegation and the proof. Defendant was not surprised, for he had in his answer alleged that the case came under the federal law. When the point was made, technically it might have been better had the plaintiff amended; but no substantial harm resulted from her failure to do so. Act Feb. 26, 1919, c. 48, 40 Stat. 1181 (Comp. St. Ann. Supp. 1919, § 1246).

[2] The one question which calls for consideration is whether the defendant was entitled to a directed verdict because of failure of the plaintiff to prove that he was negligent. The facts as shown by the record are that the plaintiff's deceased was on the morning of February 24, 1920, a flagman on a local passenger train running from Charleston to Columbia. It had left the last telegraph station south of where the fatal accident happened some 4 minutes late. When it arrived at the trestle from which the plaintiff's decedent later fell, it found the track just beyond blocked by a number of freight cars, forming part of a train, the engine of which had gone dead while attempting to pull them into a Y almost half a mile beyond. No other locomotive was at the moment available. It was important to get the track cleared as soon as possible, for everybody knew that the local was being followed by the Carolina Special, a fast express train, which was scheduled to reach the place of the block within 14 minutes after the local, if the latter had been on time, would have passed it. When the local came to an enforced stop, the express was accordingly due within 10 minutes or less. The engineer of the passenger train, which consisted of five cars, exclusive of the engine and tender, first brought his engine against one block of the freight cars. He supposed that he had coupled to them, and he pushed them ahead until the foremost of them came up to another lot (or, in railroad parlance, "cut") of them. A brakeman of the freight train tried to couple the two sections of his train, but in order to do so found it necessary to have the cut, which the passenger engine had pushed up, pulled back a little. He signaled to the passenger engineer to back. When the latter started to do so, he found that his engine had never been coupled to the first cut. It was necessary to make that coupling. After this had been done, he backed as requested, and then went forward and made the second coupling, and pushed all the stalled freight cars on the Y and cleared the track.

This operation necessarily involved some backing, pulling, and jarring; but no witness speaks of more than one of the jolts as being appreciably out of the ordinary. This one was doubtless the result of the engineer of the passenger train, while endeavoring to make one of the couplings, moving his engine forward at the rate of about 6 miles an hour, which he says himself was too fast, bearing in mind that his was a passenger train. The theory of the plaintiff was that

this jolt was one of the causes of the decedent's fatal fall. When the passenger train stopped, it was, as already stated, as much as 4 minutes late. The Carolina Special was due in 10 minutes. The cause of the detention was such that an indefinite, but appreciable, time would be required to get the track clear. Under these circumstances, what is known as rule 99 of the railroad came into operation. It reads as follows:

"When a train is stopped at an unusual point, or is delayed at a regular stop over three minutes, or when it fails to make its schedule time, the flagman must immediately go back with danger signals to stop any train moving in the same direction. At a point *one-half of a mile* (or 18 telegraph poles) from the rear of his train he must place *one* torpedo on the rail, on engineman's side; he must then continue to go back at least *three-fourths of a mile* (or 27 telegraph poles) from the rear of his train and place *two* torpedoes on the rail, ten yards apart (one rail length), when he may return to a point *one-half of a mile* (or 18 telegraph poles) from the rear of his train, and he must remain there until recalled; but if a passenger train is due within *ten* minutes, he must remain until it arrives. When he comes in he will remove the torpedo nearest to the train, but the *two* torpedoes must be left on the rail as a caution signal to any following train.

"If the delay occurs upon single track, and it becomes necessary to protect the front of the train, or if any other track is obstructed, the front brakeman must go forward and use the same precautions. If the front brakeman is unable to leave the train the fireman must be sent in his place.

"On descending grades, or during blinding storms or fog, the flagman must go as much farther than the distance named above as will insure absolute safety placing the torpedoes at relatively greater distances from the obstructions."

Strict and literal compliance with this rule is of vital importance to every one who has occasion to travel by rail. The evidence shows that the deceased did not go back, at the most liberal estimate made by any of the witnesses, over 400 feet, or something less than one-sixth of the distance he was required to go. He there placed, not one torpedo, but two, and then started on a slow run back to his train, the rear of which, upon the theory of the testimony most favorable to the plaintiff, was then slowly pulling over the trestle. Several witnesses saw him on his way back. Nobody had him in view at the instant he fell. The plaintiff's theory is, as he got to the back platform of the last car of his train, he attempted to grab it and get on its platform. At that instant the unusual jolt came, and in consequence he either could not get or keep his hold, or he slipped upon the loose and sloping stones of the trestle and fell off of it some 12 or 15 feet to the surface of the water, which was nearly 15 feet deep. There is no question that he fell and was drowned. There can be little room for difference of opinion that he in some way slipped or lost his footing on the trestle. It is by no means so clear that any extraordinary jerk of the train was contemporaneous with or immediately preceded his fall, but there was evidence from which the jury could have held that it was, if in the exercise of their right and duty, they thought they should disregard other testimony that it was not. The negligence of the defendant relied on by the plaintiff was, first, the condition of the trestle; second, the jolt. Of these in their order.

The structure complained of is what is known as a filled trestle; that

is to say, instead of the space between the ties being left open to the ground or water beneath them, a platform was put under the rails and the ties. Upon this ballast was placed, precisely as it would have been, had the trestle been a solid embankment, except that at the outer edge, on each side. there was placed a sill in shape of timber 10x14, the purpose of which was to hold the ballast in its place. The whole structure was 15 feet wide and as the track was of the standard width of 4 feet 8½ inches, there was 5 feet of space on each side of the rails, more than 3 feet of which was outside the end of the cross-ties. As on the other parts of the line the ballast was packed under the ties, but was loose from their outer ends, and it sloped down towards the sill, upon which loose stones were likely to be, either because they had been spilled there when the ballast was originally put in place, or were afterwards in same way jarred or knocked there. The plaintiff says a trestle of this kind is not safe, and of course it is not for the simultaneous use of both trains and pedestrians. It is, however, far safer than the ordinary unfilled trestle, which with its openings between the ties is always dangerous. The primary purpose of this type of trestle, as of all others, is not to supply a means by which pedestrians can go over streams or low places, although it is absolutely safe for them if one walks between the rails, as an unfilled trestle is not. No standard of reasonable care requires a railroad so to construct its trestles that they can under all conditions be safely used by pedestrians when a train is standing on them or moving over them.

[3] There remains the allegation that there was negligence in so managing the train as to cause the unusual jar. To whatever degree it was out of the common, it does not appear to have been sufficiently great to injure any of the passengers in the car. Several of the witnesses who have testified apparently were on their feet at the time it occurred, and only one complained of having lost his balance in consequence. Had the engineer any reason to anticipate that the deceased would be trying to get upon one of the cars at that time, and was he in consequence bound so to operate his train as to avoid the risk of jarring it at the moment that the decedent might be trying to get on it? It would seem that the engineer had the right to assume that the decedent was where the rule and the safety of everybody on his train required him to be, and that was somewhere not less than a half a mile in the rear of his train or on his way to that point. It has been argued that the defendant may not rely upon the violation by the deceased of this rule, because it was said it was not pleaded, and, even if it had been, this defense goes only to the question of contributory negligence which does not bar the recovery. Neither contention is sound. Before any question of contributory negligence can become important, and before the defendant is called upon to make or allege any affirmative defense, the plaintiff must show that he was negligent in some manner of which the deceased had the right to complain. This, in our view, she has failed to do.

Railroading is a dangerous occupation. A certain number of accidents will happen without the companies having fallen short of the

highest care reasonably practicable. Sometimes the injured employee is equally free from blame, and sometimes, while negligent, he is not more so than, at one time or another, almost every human being is likely to be. In all these cases his injury or his death is a part of the cost of transportation. It is always open to Congress by some form of workmen's compensation legislation to charge it upon the business. It must be assumed that, in the judgment of Congress, there has been, up to this time, good reason why this should not be done. It is not for the courts, under such circumstances, to impose upon the railroad companies the burden of an insurer of the safety of their employees. It follows that, because of the failure of the plaintiff to show negligence upon the part of the defendant, it was error to refuse defendant's prayer for an instructed verdict in his favor. The judgment below will in consequence have to be set aside and a new trial awarded.

Reversed.

WADDILL, Circuit Judge (dissenting). A careful review of the proceedings in the trial court will show that this case was there given full and most intelligent consideration by an exceptionally able and painstaking judge, and I am convinced that under the law as given by the court, and upon the facts as found by the jury and approved by the court, the plaintiff is clearly entitled to recover. It will be observed that the majority opinion, holding adversely to the plaintiff's right of recovery, is largely based upon the negligence of the decedent in carrying out the rule of the company prescribed for his conduct, in flagging trains coming from the rear, and that in doing so the decedent should have been off the trestle where the accident happened, in a place of safety approximately half a mile away.

Of course, if the decedent had not been at the scene of the accident, he would not have lost his life; but it is most significant that, had the alleged grounds of exemption from liability been available as a defense, the experienced attorneys representing the railroad did not plead the same in bar to the action. They filed their grounds of defense, and nothing of this sort was included, and the same was only for the first time suggested during progress of the trial. It is perhaps proper to say, in answer to the claim that the deceased at the time of the accident should have been half a mile away from his train, and running in the opposite direction, under the construction placed upon the rule in question, that the deceased did and had complied with the rule in the manner his experience of 25 years as a brakeman and flagman had taught him was the practical and proper way to do. He left his position on his train to flag the incoming train, which was stopped; he doing what was necessary to that end. He then immediately ran to his position on his own train, as an intelligent and faithful employé should have done in the emergency and exigency then existing.

In signaling the incoming train from the south in the manner he did, plaintiff's intestate fully complied with the meaning and spirit of the rule under which he was acting. The engineer of the approaching train says that, in coming into Kingville, he saw No. 13 train, on

which the deceased was brakeman, and struck two torpedoes about 400 feet east of trestle 104–6, on the Charleston side; that his train was rolling along slowly, and that his conductor signaled him down violently, and he applied his brakes and stopped his train. The two-torpedo signal is known as the "caution" or "warning" signal, and the one-torpedo signal, known as the "stop" signal, is given a quarter of a mile beyond the two-torpedo signal. Of course, on an occasion like the present one, where it was neither necessary nor practicable to give the stop or last signal, the requirements respecting the same had no application. The uncontradicted evidence, from passengers on the train to which deceased belonged, is that he was seen returning in a run to his train, from where he had been to place the two torpedoes, with the incoming train in full sight. What more could he, or should he, have done? To continue onward in the face of the approaching train, and in the absence of danger, to place one torpedo, would have been ridiculous. He did just what he should have done in the then conditions. He placed the two caution or warning torpedoes, and rushed back to his station on the train, with a view of facilitating its movements, and the opening up of traffic on the line. Upon reaching his train, which was then on the trestle coupling up and moving, he attempted to board the same, and either by a sudden jerk of the engine, caused by the backing of the forward portion of the separated train, or by the unsafe condition of the trestle, he was thrown therefrom into the water below and drowned.

The case turned upon (a) whether the defendant, in the construction of the top of the trestle, with a slant to the outer edge, and with rocks and pebbles loosely and insecurely placed, forming the top surface thereof, without railing or side protection, furnished the decedent with a reasonably safe place in which to perform the service required of him; (b) whether the forward end of the train on which decedent worked, and which had been separated from the rear part in order to clear the track ahead, was negligently driven back with such force as to throw the decedent into the water below; and (c) whether the deceased was guilty of contributory negligence disentitling his personal representative to recover in whole or in part. The jury, after hearing the entire testimony, a large number of witnesses having been examined, and in the light of the comprehensive and able charge of the court, and the arguments of distinguished counsel fresh in their memory, solved the several issues of fact in favor of the plaintiff, and returned a verdict in her favor. Full hearing was had on application to set aside the verdict and grant a new trial, and the same was overruled by the court, and judgment rendered in favor of the plaintiff for the full amount of the verdict.

Just why the finding of facts, the verdict of the jury, and the judgment of the lower court should be, or can be, legally set aside and vacated, is hard for me to perceive. On the contrary, in my judgment, the case is plainly one for affirmance.