THERESA N. KENNEY, *Adm'x v.* BOSTON & MAINE RAILROAD.

*Murchie & Murchie (Mr. Alexander Murchie* orally), for the plaintiff.

*Demond, Sulloway, Piper & Jones (Mr. Piper* orally), for the defendant.

PAGE, J. The deceased was head brakeman on the train. The accident happened in Merrimack. The defendant's line was double-tracked and ran nearly north and south. The train was proceeding south on the westerly track at about two o'clock in the morning of August 19, 1939, when it stopped for the movements later to be described, near the close of which the accident happened. It was a dark night. The train crew had to leave two cars and take on another at Merrimack. With this in view the train was brought to a stand with the locomotive just north of a block signal situated over 1,400 feet north of the Merrimack Station.

South of the block signal, at a distance of 465 feet and on the west track, was a switch that gave access to a siding running northwest from the main track. This was known as the McElwain Siding. South of this switch, 241 feet, was the north end of a bridge carrying the two main tracks over a stream. This bridge was 119 feet long. South of the south abutment of the bridge, a distance of 631 feet, was the north end of the Merrimack Station, which extended south a distance of 57 feet. South of the south end of the station, in the west track, 535 feet distant, was a switch giving access to the Excelsior Siding. Along the west side of the tracks, north and south of the bridge, the shoulder was more or less beaten, but there was no evidence that this "path" was ever used except by the section men employed by the defendant and by a single workman at the Excel-

sior Factory who lived at Reed's Ferry one and a half miles north of the station. There was no house in either direction from the station for a mile and a half. The bridge was in the woods, and it had no walkway. Under the circumstances of the travel on foot in the vicinity, it could not be found that a walkway was reasonably required.

The train crew on the night of the accident consisted, besides Kenney, of the engineer, the fireman, the conductor and the rear brakeman. When the freight train of about fifty cars stopped just north of the block signal, the conductor and the rear brakeman were in the caboose at the rear end. The rear brakeman went back, when the stop was made, to act as flagman for the protection of the train while it was detained for the operations at Merrimack. The conductor remained in the caboose according to custom. Kenney, who had ridden from the last station in the locomotive, bearing a written memorandum of instructions from the conductor as to switching operations at Merrimack, proceeded to put these instructions into effect. The succeeding movements were under his direction, he giving the engineer all necessary signals for stopping and for motions forward or backward, signals that under the rules the engineer was bound to obey. It was Kenney's duty also to see that switches were thrown when necessary, that cars were properly moved and placed, that the cars were properly coupled or uncoupled and the air hose disconnected or connected as the movements required.

First Kenney uncoupled the head car from the train. At his signal the locomotive and the single car went south sufficiently to clear the McElwain switch. This required the head of the locomotive to go no more than half way from the switch to the bridge, and the car on which Kenney rode merely to pass the switch. This car was then backed, after Kenney threw the switch, into the McElwain Siding and left there. The locomotive then drew out onto the main track, Kenney closed and locked the switch so as to permit passage on the main line, and the switch remained closed and locked in that position until after the accident.

The next movement was for the locomotive to back up to the train and couple onto what was then the forward car, formerly the second, which was detached from the train, drawn south over the bridge past the station, and set upon the Excelsior Siding. At this siding an empty car was taken by the locomotive to the main line and backed to the station, where it was stopped and Kenney got the

way bill and remounted the car. This car was a box car with a ladder at each end, and also a side ladder at each end. There was no defect in the car, in the ladders, in the steps, in the holding-irons, in the locomotive.

There was now nothing left to do at Merrimack except to back up to the other cars north of the block signal, reunite the train, and proceed south on the way to the next stop. In spite of the darkness, the point for the stop in order to effect the coupling was spotted by two lights on the block signal. It was the duty of Kenney to signal for the stop and of the engineer to obey the signal. There is no evidence at all that there was any occasion for a stop until just after passing the block signal. For no explainable reason, however, the locomotive and the car it was pushing came to a stop with the south end of the car Kenney was riding some eight or ten feet north of the south abutment of the bridge and over 750 feet south of the block signal. The engineer testified that he stopped because Kenney gave him a signal, but the plaintiff at certain stages of the trial contended that no signal was given. In either event, no witness could assign any reason for stopping at that point, and there is no evidence at all that the business in hand required it.

After the stop, the engineer saw Kenney climb with his lantern down the westerly side ladder of the car, topple and fall. He was found on the rocks below, partly in the water, and died of his injuries. The bridge was not an open trestle, but filled with rock ballast its full width. There was no rail. Between the car and the west margin of the bridge the space was about thirteen inches.

The plaintiff alleges that the defendant is chargeable with causal negligence in one or more of three respects: (1) in not providing the bridge, as a work-place, with a cat-walk and a rail; (2) in not warning the deceased of the lack; (3) in that the negligence of a fellow servant of the deceased caused his injuries and death.

Considering the circumstance of the distance of the bridge from the two switches, there is not the slightest evidence that the defendant or any of its agents or employees should have anticipated that the deceased in the course of his duties would have occasion to alight upon the bridge. As far as appears, he had occasion to alight on the main track only at the switches and station. The test of the duty of the defendant to make the bridge safe as a work-place being anticipation (cf. *D'Ambrosio* v. *Railroad*, 81 N. H. 119) no duty in that respect can be found. The bridge was not a work-place in the sense that might perhaps have been found if the shifting operations

were likely to result in a car standing on the bridge. See *Hull* v. *Company*, 78 W. Va. 25, possibly erroneously decided because of oversight of findable anticipation. The deceased was not performing such work that the bridge was his contemplated work-place, findably requiring a rail for his protection, as was the case in *Thomson* v. *Boles*, 123 Fed. (2d), 487, and *Bailey, Adm'r* v. *Railway*, 63 S. Ct. 1062, May 24, 1943. Nor could it be found that the train stopped on the bridge because of a foreseeable emergency, as might perhaps have been found, though it was not, in *Davis* v. *Shirer*, 288 Fed. 293; and *Reetz* v. *Company*, 46 Fed. (2d) 50. As remarked in the case last cited, the defendant's bridge was of modern design, in a good state of repair, similar to other bridges located as this was. Further, it was adapted and intended for nothing except the passage of train and section men, barring at most foreseeable emergencies. The plaintiff denied at the trial that this was an emergency stop. There is no least evidence that there was either custom or foreseeable reason for furnishing such a bridge, so located, with a foot-walk or rail for the protection of one employed as the decedent was.

The plaintiff relies upon *Cawman* v. *Pennsylvania &c. Lines*, 110 Fed. (2d) 832. The facts are so meagerly stated in that case that it is impossible to know how it fits into the grouping of authorities. We can do no more than assume that it is consistent with the rule above stated. As it stands, it proves no more than that under some circumstances a bridge may be found to be a work-place for a freight brakeman, and as such it ought to be railed. That may be conceded for the purposes of this case without need of its application here.

Likewise the duty to warn and instruct the deceased as to the danger of an unrailed bridge could arise only if he needed warning of a defect in the findable work-place and the defendant had reason to know that he needed warning. It is not sufficient for the plaintiff to say that the deceased did not assume the risks that he knew though it is true that the Federal Act deprives the defendant of the defence of assumption of risk as that phrase is sometimes used. *Tiller* v. *Company*, 318 U. S. 54.

In the case before us we cast aside completely any thought of what the deceased "assumed" and inquire solely as to what the defendant in the exercise of care should have done by way of warning the deceased that there was no rail on the bridge. If there was no findable negligence in maintaining the bridge without a rail,

it would be nonsense to say that the defendant owed any duty to tell the deceased that there was no rail, whether the deceased knew about the lack or not, unless the defendant had reason to anticipate that the lack of a rail constituted a danger to him. In this case there is no occasion to inquire what Kenney had in his mind concerning the rail or the want of it. If the lack of a rail did not charge the defendant with causal negligence in providing a work-place, the lack of a warning could not be causal negligence.

Finally we come to the question whether any negligence of a fellow-servant can be found to have caused Kenney's injuries and death. The testimony showed that as the locomotive backed north after completing operations at the station, Kenney stood on top of the west side of the box car that the locomotive was pushing, while the engineer sat on the arm rest on the west side of his cab, with head and shoulders out of the window, looking backward and watching Kenney's lantern for signals. According to the engineer, Kenney gave a normal stop signal, not an emergency signal, and the engineer made a normal service stop. The engineer then saw Kenney climb down the ladder and topple over.

Concerning the giving of this signal the plaintiff's counsel took three distinct positions during the course of the trial. In his original declaration and the first amendment thereto, there were allegations that Kenney gave the signal, and this position involved his assuming the burden of proving that subsequent to the signal there was negligence by the engineer. The second position, when late in the trial the plaintiff amended by withdrawing the allegation that Kenney gave the signal, involved the burden of showing that the stop was due solely to the negligent act of the engineer. The third position was that Kenney gave the signal to stop but was induced thereto by a negligent signal given by the conductor. These positions will be considered in order.

On the theory that Kenney gave the signal as testified to by the engineer, it could not be found that the stop on the bridge was due to the engineer's negligence, for two reasons. First, under the rules of the railroad it was the plain duty of the engineer to stop on signal without delay. Second, there is no reason why, in the exercise of care, action under the rule should have been modified. It was a dark night. The rear light of the locomotive, never on when a car is attached, afforded no illumination. The only light was Kenney's lantern. The fireman, who was looking north out of the east window of the locomotive did not, and could not, see the bridge. The engi-

neer said that he did not see it, and that he was looking towards Kenney's lantern atop the car. It is not likely that Kenney, though directly over the bridge and with a lantern, knew that he was above the bridge. If he had known it, he would almost surely have stepped off safely upon thirteen inches of free standing space. If he had known where he was and had stepped off as he did, his negligence would have been the sole proximate cause of his injuries and death. The two engine men, at least fourteen feet from the bridge after the stop was made, and more than seventy-five feet from it when the signal to stop was given, could not be charged with negligence for not knowing that the stop was likely to be made, and was in fact made, with the box car on the bridge. That would be to charge the deceased's fellow servants with knowledge of Kenney's danger which Kenney himself, if anybody, ought to have known, and probably did not know. Taking the facts most favorably for the plaintiff, Kenney ought not to have known. It would stretch judicial imagination to sustain recovery on so flimsy a theory of fault as that the other trainmen should have known.

The plaintiff says, however, that the jury might disbelieve the engineer's testimony that Kenney gave him a signal to stop. It is urged that the failure of the fireman to see a signal is evidence that none was given. The engineer was watching for a signal, as it was his duty to do when Kenney was riding on his side. The fireman was watching along the track, as it was his duty to do under the circumstances. The fireman was not looking for a signal, and had no occasion to see it. There is no evidence that, given the position of Kenney, the fireman could have seen the signal if he had looked, and direct evidence that he could not. Under the circumstances the failure of the fireman to see the signal is of no value to establish the fact that no signal was given. We need remark further only that if no signal was given we have a totally unexplained stop, with Kenney getting off into an abyss for no explainable purpose. Unless explained, his act was his own, whether it was careful or careless. There is no evidence at all of any negligent act by the engineer.

The third position taken was indefensible. The plaintiff introduced a rule providing that freight conductors must see that hand brakes are set on cars left on sidetracks. The suggested conclusion was that, disbelieving the unanimous testimony of the train crew that the conductor never left the caboose during all the switching operations, nor until after the accident, it might be found that he was present near the locomotive at the time of the accident, seeing

that the cars were all braked instead of leaving that to the brakeman under his orders. The next step in this peculiar evidentiary trail was for the jury to guess, without a shred of evidence, that the conductor gave Kenney a signal to stop, that Kenney relayed it to the engineer; that the conductor's signal was negligently given and that Kenney thereby lost his life.

On the facts, omitting speculation as we must, this appears to be even a weaker case than *Baltimore & Ohio Ry.* v. *Berry*, 286 U. S. 272, where the conductor gave the brakeman orders to get off for a railroad purpose and the brakeman stepped into space. The court said in that case: "There was no evidence that either the conductor or respondent knew that the caboose had stopped on the trestle and . . . their opportunity for knowledge as each knew, was the same. . . . There was no evidence that the respondent could not have discovered the danger by use of his lantern or by other reasonable precautions, or that he in fact made any effort to ascertain whether the place was one where he could safely alight. . . . If negligence caused the injury, it was exclusively that of the respondent. Proof of negligence by the railroad was prerequisite to recovery under the Federal Employers' Liability Act."

The complaint that no other brakeman stood at the McElwain switch comes to nothing. The lack of such a man at that point could not be causal, for operations involving that switch had long since been completed. The claim that lack of lights on the north end of the car was causal negligence is not sustained. There is not the least evidence that such lights are ever used, that they could be used, or that due care requires their use, or that such lights as could be made available would have avoided the accident. The objection that Kenney had to do alone all of the groundwork at both switches is immaterial, since he had no more switchwork to do. The claim that there should have been lights at the bridge stands exactly like the claim as to the lack of a rail.

Since there was no evidence to support a finding of causal negligence on the part of the defendant or any employee, it was error to deny the motions for a nonsuit and for a directed verdict. There is no need to discuss the question of dependency that was fully briefed and argued.

*Judgment for the defendant.*

All concurred.