## MAIN ISLAND CREEK COAL CO. v. CHESAPEAKE & O. RY. CO.

Circuit Court of Appeals, Sixth Circuit. January 3, 1928.

No. 4869.

1. Carriers ⚖══100(1)—Railroad's acqulescence in theory that demurrage charge did not apply to loaded cars at place 100 miles from mines during emergency did not avail shipper after emergency passed.

Acquiescence of railway company and coal shippers in theory that general demurrage rules requiring demurrage to be paid on cars held for shippers beyond minimum limit did not apply to loaded cars on tracks at place 100 miles away from mines during war emergency, under tariff rule excepting cars loaded with coal at "mine sidings," could not avail shipper after emergency had passed and emergency practice had been discontinued.

2. Carriers ⚖══100(1)—Demurrage tariff rule, excepting loaded cars at "mine sidings," did not except cars at place 100 miles from mines.

Demurrage tariff rule, excepting "cars under load with coal at such mines, mine sidings," etc., was not ambiguous, so as to make it open to binding practical construction that "mine siding" meant yards 100 miles away from coal mines, and tariff did not except loaded cars on tracks at such yards held without shipping directions.

3. Carriers ⚖══100(1)—Railroad, by collecting freight charges from consignee without demanding demurrage, did not waive right to demand demurrage from consignor.

Under bill of lading clause, providing "the owner or consignee shall pay freight and all other charges accruing on said property, and if required shall pay same before delivery," railway company, by collecting from consignee regular freight charges on coal from mines to destination without demand of demurrage, did not waive right to assert demand against consignor, as owner, for demurrage.

In Error to the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Action by the Chesapeake & Ohio Railway Company against the Main Island

Creek Coal Company. Judgment for plaintiff, and defendant brings error. Affirmed.

E. L. Hogsett, of Huntington, W. Va., and John L. Smith, of Catlettsburg, Ky. (Martin & Smith, of Catlettsburg, Ky., on the brief), for plaintiff in error.

Le Wright Browning, of Ashland, Ky. (Browning & Reed, of Ashland, Ky., on the brief), for defendant in error.

Before DENISON, MACK, and MOORMAN, Circuit Judges.

DENISON, Circuit Judge. The railway company maintains extensive yards at Russell, Ky. The coal bound north or west from the coal company's mines all passes through Russell. During the governmental administration of the railroads and for a period afterward there was a great shortage of cars at the mines. All parties concerned adopted a practice by which the cars, as soon as loaded, were shipped from the mines to Russell without formal billing, but only on cards or tickets. There they were weighed, the railroad company was supplied with the name of the consignee, and they were shipped out on a B/L as if directly from the mines to destination. At this time the general demurrage rules required demurrage to be paid upon any cars held by or for shippers beyond the minimum limit, but the car distribution rules provided that, if the mine did not use all of its quota delivered to it on one day, the remainder should be charged against its quota for the next day, and the general demurrage rule was displaced at the mines by this distribution rule.

In this period of great demand for coal there was not much delaying of cars on the track at Russell, but such delay as did occur was treated as if it had occurred at the mine and as covered by the distribution rule, and demurrage was not charged. After the more active demand for coal ceased and loaded cars began to be held unduly at Russell without shipping directions, the company, by formal notice, withdrew the tariff clauses which had permitted this situation to be treated under the distribution rule, and gave notice that thereafter demurrage would be charged under the regular tariff provisions therefor. The coal company protested against this arrangement and did not pay demurrage, and there accumulated a considerable sum, for the recovery of which the railway brought this suit in the court below against the coal company. The case was tried by stipulation without a jury and upon an agreed statement of facts, which was given status as findings of fact.

[1] Only two questions were presented below or here. The defendant's first point was that the demurrage charge, otherwise unescapable, was not applicable, because the tariff rule on the subject excepted "cars under load with coal, at such mines, mine sidings, etc.," and it is said that these Russell yard tracks (perhaps 100 miles away) by usage had become mine sidings. The acquiescence of all parties in this theory might have justified some delays at Russell under the practice which formerly had been pursued, while that acquiescence continued; but it could not change the geographical fact, nor avail after the emergency had passed and the emergency practice had been discontinued. As the District Judge accurately said:

[2] "The shipping of coal-loaded cars to the Russell yards by card billing, as the method was called, was initiated during the war to relieve the shortage in cars used for transportation of coal. The demand for coal was greater than the supply. In this way the transportation of coal could be handled more efficiently than it was being done under the usual method. It contemplated no storage of cars at Russell yards, and there was none. The storage of the cars in question came about through the depression in the coal business which ensued, and when the supply exceeded the demand. It was entirely optional with defendant whether it would continue to ship according to this method, and, had it limited its shipments to its sales, there would have been no demurrage."

We agree with the trial court that there was no such ambiguity in the demurrage tariff as made it open to a binding practical construction that "mine siding" meant "Russell yards," even if that joint practical construction had not been discontinued long before this demurrage claim arose.

[3] The second point presented by the coal company is that the B/L, by section 8 of the conditions in the standard form approved by the Interstate Commerce Commission, February 27, 1900, provided: "The owner or consignee shall pay the freight and all other lawful charges accruing on said property, and, if required, shall pay the same before delivery." It is said that by collecting from the consignee the regular freight charges from the mines to destination, without demand of demurrage, the railroad company waived or became estopped to assert any demand against the consignor, as owner, for

this demurrage. This claim is said to be supported by the opinion of the Fifth Circuit Court of Appeals in Yazoo & M. V. R. Co. v. Zemurray, 238 F. 789. If that decision is to be so construed, we think it must be considered to be inconsistent with the decisions of the Supreme Court in Pittsburgh Co. v. Fink, 250 U. S. 577, 582, 40 S. Ct. 27, 63 L. Ed. 1151, and L. & N. R. R. v. Central Co., 265 U. S. 59, 65, 44 S. Ct. 441, 68 L. Ed. 900, which hold that no act of the carrier can estop it from enforcing payment of the full amount of the freight charges by the person liable. In the present case, no such question can arise as was mentioned in the case in 265 U. S. on the subject of the duty of the carrier to endeavor to collect from the consignee before resorting to the consignor, since in that case the bill of lading did not contain any clause which made the consignor, equally with the consignee, primarily liable.

The judgment is affirmed.