## PAULY v. McCARTHY et al.

No. 6846. Decided February 18, 1946. (166 P. 2d 501.)

Rehearing Denied May 31, 1946.

400

See 21 C. J. S., Courts, sec. 206; 35 Am. Jur., 651.

*Farnsworth & Van Cott* and *Grant H. Bagley,* all of Salt Lake City, for appellants.

*Rawlings, Wallace & Black,* of Salt Lake City, for respondent.

WOLFE, Justice.

Appeal from a judgment under the Federal Employers' Liability Act in favor of plaintiff. Plaintiff, who was employed by defendant in interstate commerce as a conductor on a freight train proceeding over appellants' line westerly out of Glenwood Springs to Grand Junction, Colorado, was injured by a fall when he alighted in the nighttime from a caboose, which was standing on a bridge or trestle so narrow on the south side as to afford no foothold to one getting off the train at that point.

Conflict in the evidence is very limited and, as we view it, unimportant. The undisputed facts are as follows: The accident happened about 11:50 p. m. on January 27, 1944, between the switches on the passing track at Chacra, Colorado. Shortly after leaving Funston, which is six miles east of Chacra, Pauly, the conductor, and Ventura, the rear brakeman, who were riding in the caboose, noticed sparks

flying from a car about 15 or 20 car lengths ahead of the caboose. This was ordinarily a sign that the brake shoes were sticking and necessitated stoppage of the train. By means of a red fusee placed outside of the window of the cupola of the caboose Pauly signalled the engineer to stop the train. The train consisted of 86 cars, the engine and the caboose and was somewhere between 3870 and 4300 feet long. The fireman in the engine also noticed the sparks flying from the wheels. The head brakeman acknowledged the stop signal by motion of an electric hand lantern. The engineer stopped the train on the main track opposite and south of the passing track at Chacra at a point which put the caboose on a bridge spanning North Canyon Creek. The distance between the east and west switches of the passing track at Chacra is about 6600 feet. The bridge is 2000 feet west of the east switch. The engine was thus somewhere between 3870 feet to 4300 feet west of the bridge. The engineer testified it was between 600 and 700 feet east of the block signal at the west end of the passing track.

The bridge is approximately 26 feet wide and 92 feet 6 inches long. The main line track is south of the passing track. The distance between the north rail of the main track and the south rail of the passing track is approximately 12 feet. The distance between the south rail of the main line track and the outside or southern edge of the bridge is 2 feet 9 inches. The overhang of an ordinary freight car or caboose is approximately 2 feet 6 inches. The lowest steps from the platforms at each end of the caboose reach to the edge of the overhang but not beyond.

Pauly, at the time and in the darkness, after the train had stopped and while the caboose was standing on the bridge, released his hand from the hand bar on the side of the caboose and dropped off the steps of the front (west) end of the caboose into space past the south edge of the bridge down to the creek bed about 17 feet below the bridge and was severely injured. There were no lights showing the presence of the bridge and no catwalk on the south side of the bridge but there was a walk over the bridge between

the main and the passing track. Had Pauly stepped off the north side of the caboose he would have reached footing on this plank walkway. The night was quite dark. The roadbed was of black ballast which made it indistinguishable from the black timbers of the bridge. It was just beginning to snow.

Pauly, at the time of the accident, was 36 years of age. He had been crossing over this particular bridge for seven years in both day and nighttime; had, he estimated, crossed the bridge 1000 times and had walked over the bridge between the tracks perhaps fifty times, ten of which may have been at night.

The action is brought under the Federal Employers' Liability Act as amended in 1939, 45 U. S. C. A. § 51 et seq., eliminating assumption of risk as a defense.

The complaint alleged negligence on the part of defendants as follows:

"A. That at said time and place the defendants carelessly, recklessly and negligently so operated and maintained their tracks, roadbed and equipment and in particular the bridge which spanned the creek between the switches at Chacra, Colorado, as to cause plaintiff while acting in the course of his employment to be hurled headlong from said bridge onto the bed of the creek below, thereby and thus causing him to suffer the injuries and damages herein complained of.

"B. That the defendants, and each and all of them, negligently, carelessly and recklessly failed and neglected to furnish plaintiff a safe place whereon and wherein to perform the duties necessarily incident to his said employment in this: that said defendants well knowing that their passenger and freight trains were customarily and ordinarily stopped upon defendants' main line and passing tracks between the east and west switch points at Chacra, Colorado at all times of the day and night and in all kinds of weather, and that it was usual, customary and necessary for members of various train crews to pass along said trains while they were so stopped upon said main line and said passing track for the purpose of examining said trains and the various cars therein, and that said bridge in darkness was indistinguishable, dangerous and hazardous, nevertheless wholly failed to make said bridge safe and wholly failed and neglected to build, construct and maintain a walk with handrails on the sides of said bridge and did wholly fail and neglect to provide any lights or markers to indicate the presence or the dimensions of said bridge and

did wholly fail and neglect to provide any other means whatsoever to give warning of the existence or the dangers of said structure, or to protect and shield their employees from the dangers thereof, as a result whereof the plaintiff while in the discharge of his duties was caused to and did fall headlong from the caboose of his said train over the edge of said bridge and onto the bed of said creek resulting in the damages and injury to him as herein complained of."

There is no evidence in the record to support the allegations of paragraph 9A. The plaintiff was not caused to be hurled from the bridge by the operation of the train, nor by the negligent maintenance of tracks, bridge or roadbed. The train had stopped. The evidence is conclusive on the fact that Pauly was under the impression that the caboose had entirely passed over the bridge; that he did not use his lantern which he had on his arm to make any examination of the place where he was to alight; that—giving him the benefit of that part of his testimony most favorable to himself—he "glanced down; it looked black like the road-bed and I just stepped off." There is no question as to Pauly's negligence. The jury found that he was guilty of contributory negligence and after finding his damage at $75,000, the full amount prayed for, subtracted $25,000 as the damage attributable to his negligence, leaving a net verdict of $50,000, which the court reduced as a condition of refusing a new trial to $34,500.

1. *Were the passing tracks at Chacra a place to work:* Was the region in between switches at Chacra a "place to work" as is meant by that term in the law of negligence? There were no industries in that locality or any spurs or sidings on which switching was done. There was only a passing track. The main road was single tracked. The passing track was one of many on the road to take care of train "meets." It was in Centralized Traffic Control territory, which means that the trains are let in and out of the passing track by an operator without necessity of the local crew having to get off and throw switches. When there is trouble with the moving equipment on the road and it is

possible to reach the passing track at Chacra the train moves in there so as not to hold up traffic. It is a fair inference that such sensible procedure is followed anywhere in single track territory. Undoubtedly if the trouble is such as will not permit the train to proceed into a passing track for inspection and remedy, the matter must be attended to at once on the main track. There is nothing to show that the procedure is any different at the Chacra passing track than at any other passing track when a train in trouble is moved there for inspection and remedy. Indeed the same sort of inspection and remedy in regard to hot boxes, sticking brakes, break-in-twos, broken air hose, might have to be made anywhere on the main line if a passing track could not be reached. The Chacra passing track was a more favorable place to stop than many sidings because it was a "high ball" station, viz., it enabled signals from the rear to be seen at the engine which was not the case in many parts of the road where the tracks curved through the mountains. But it would be only good fortune in that respect that the trouble or its discovery occurred shortly before coming into Chacra.

Ventura, the rear brakeman, testified that trains are stopped at Chacra to enable other trains to pass and that

"if there is any trouble with the train there, they see a red fusee back there, they should stop." Question: "Stop on the passing track to make an investigation?" Answer: "Yes sir."

There is no evidence that investigations are made while the trains wait at the passing track or for any other reason, unless there is some trouble. There is no evidence that the procedure in that respect is different at Chacra than at any other passing track; that it was

"usual, customary and necessary for members of the various train crews to pass along said trains while they were so stopped upon said main line and passing track for the purpose of examining said trains and various cars therein. * * *"

If the passing track at Chacra is a place to work then every other passing track on the road is by the same token

a place to work. And in fact since repairs, adjustments or temporary improvisations may be necessary anywhere at any time along the main line, the whole main line would then have to be considered as a place to work for train crews engaged in spotting defects in cars or the locomotive which the motion of the train revealed and which interfered with its movement. Thus if the engineer discovered something wrong with his locomotive which necessitated his descending from his cab to inspect and remedy the defect, practically the entire shoulder along the roadbed would have to be kept safe for his descent because it must then be considered a place to work. We think the fact that because of facilitation of traffic, it is convenient to pull into a passing track to inspect and make temporary repairs does not constitute all the shoulder along the roadbed between switches of the passing track a place to work. As before stated, there is no evidence that the train crews were required to make train inspections at the Chacra passing track while simply waiting for a train to pass. The evidence is that in the occasional instance when something goes wrong that interfers with movement at a point from which it is possible to pull into the Chacra pass, the engineer for convenience of traffic does so, and then inspection is made to exactly locate the trouble for the purpose of remedying it sufficiently at least to permit continuance of movement.

This is not the case where due to a failure to keep the tracks and roadbed in a safe condition, the engine or cars left the track or employees were hurled from the train to the injury of members of the train or engine crew. The engine and train is the equipment on which the engine and train crew work. It has been held that the tracks and roadbed where the train moves along also constitute, while the workmen are on the moving equipment, the place where they work and must be kept in reasonably safe condition so as to avoid accidents due to a defect in said roadbed or tracks while operating the train. *Union Pacific Railway Co.* v. *O'Brien,* 161 U. S. 451, 16 S. Ct. 618, 40 L. Ed. 766; *Chicago & A. R. Co.* v. *Kerr,* 148 Ill. 605, 35 N. E. 1117; *St. Louis*

& S. F. Ry. Co., v. *Weaver*, 35 Kan. 412, 11 P. 408, 57 Am. Rep. 176; *Cincinnati N. O. & T. P. R. Co.* v. *Zackary's Adm'r*, Ky., 106 S. W. 842; *Gordon* v. *Chicago R. I. & P. R. Co.*, 146 Iowa 588, 589, 123 N. W. 762. In *Fink* v. *Slade,* 66 App. Div. 105, 72 N. Y. S. 821, distinction was drawn between a defect in the locomotive or cars which caused them to leave the track as compared to a defect in the road-bed. The first it was said was a defect in the machine which the master supplied, the second a failure to provide a safe place to work. In the instant case as far as Pauly's work *on* the train was concerned the train, roadway and bridge were a safe place to work. There was no giving away of the bridge which made Pauly unsafe while on the train. It was only when he left his safe position on the train without care to ascertain the safety of the place where he would alight that he put himself in peril.

The plaintiff sought to force this case into the framework of those cases where the work by its nature and purpose was necessarily confined to a limited locus or a particular spot and employee was required or it was reasonably necessary that he be at the danger spot, illustrated by the cases just following, the italicized portion of the explanation note in parenthesis showing why it was a place to work: *Bailey* v. *Central Vermont Ry. Co.*, 319 U. S. 350, 63 S. Ct. 1062, 87 L. Ed. 1444 (Section hand unfamiliar with opening of hopper doors on car of ballast *spotted on bridge* over cattle pass was thrown from bridge having no guardrails by spinning of wrench by which he was opening the hopper doors. *Bridge of necessity was definite and assigned place to work.) Chicago Great Western Ry Co.* v. *Peeler,* 8 Cir., 140 F. 2d 865 (Under Federal Employers' Liability Act after 1939 Amendment. Protruding plank as part of crossing caused appellee to trip while he was *engaged as switchman in assisting movement of cars in Des Moines yard.) Smith* v. *Schumacker,* 30 Cal. App. 2d 251, 85 P. 2d 967. (Embedded angle iron in ballast causing rear brakeman required to run for caboose after *throwing switch* to stumble.) *Haskins* v. *Southern Pac. Co.*, 3 Cal. App. 2d 177,

39 P. 2d 895 (Under F. E. L. A. 1934. Plaintiff stumbled over tough umbrella plant root permitted to grow on right of way where plaintiff *was required to work in switching operation on a siding.) Virginia R. Co.* v. *Staton,* 4 Cir., 84 F. 2d 133 (Permitting spike to protrude on which brakeman's clothing caught *during a switching operation.) Bly* v. *Southern R. Co.,* 183 Va. 162, 31 S. E. 2d 564 (Under F. E. L. A. Failure to provide a walkway on a bridge *where switching operations were conducted.). Thomson* v. *Boles,* 8 Cir., 123 F. 2d 487 (Under F. E. L. A. Failure to keep guardrail on bridge in repair so that it gave way *while an employee engaged in giving signals* to engineer of work train engaged in driving piles in bridge.) *Bimberg* v. *Northern Pac. R. Co.,* 217 Minn. 187, 14 N. W. 2d 410, 419 (Carpenter dispatched to repair a trestle constructed without guardrails and workmen not equipped with safety belts.) *Knowles* v. *Southern R. Co.,* 177 Va. 88, 12 S. E. 2d 821 (Under F. E. L. A. Deceased *required to check and list cars on narrow bridge.) Melody* v. *Des Moines Union R. Co.,* 161 Iowa 695, 141 N. W. 438 (Permitting snow and ice to accumulate in the switch yard *where plaintiff was assigned to work.) Southern R. Co.* v. *Wilmouth,* 154 Va. 582, 153 S. E. 874 (Under F. E. L. A. before 1939 Amendment. *Duty of Wilmouth to obtain at night list of car numbers* on bridge where plank flooring on west side ended leaving openings.) *David* v. *Souder,* 134 Va. 356, 114 S. E. 605 (Rolling action of cinders allowed to accumulate on retaining wall under plaintiff's foot caused him to be precipitated over wall on which plaintiff was walking for *purpose of closing switch to spur tracks.) Morton* v. *Alton R. Co.,* Mo. App., 118 S. W. 2d 59 (Under F. E. L. A. before 1939 Amendment. Deceased, a bridge painter, fell from bridge *while in usual work of delivering paint* and was drowned.) *Hanson* v. *Great Northern R. Co.,* 128 Minn. 122, 150 N. W. 380 (Plaintiff while at *work in narrow area clipping surface of stone parapet* lost his balance and fell.) *Southern R. Co.* v. *Newton's Adm'r,* 108 Va. 114, 60 S. E. 625 (Railroad permitted open trench to exist on pathway along track *used by men at switching*

*station for detaching cars while on the move.) Cincinnati N. O. & T. P. Ry. Co.* v. *Zackary's Adm'r,* Ky., 106 S. W. 842 (Charged that railroad failed to keep roadbed of connecting track in reasonably safe condition whereby train left track and conductor *engaged in switching* was thrown from car and killed.)

We do not think there is sufficient evidence to go to the jury on the question of whether the passing tracks at Chacra were a place to work. The answer put in the mouth of Ventura by the leading question "stop on that passing track to make an investigation?" appears ■ by reference to his answer given just before to relate to the times when trains pull in there because of trouble. The engineer, Linkins, did not so testify. The inference from all the other testimony as to the use of the passing tracks was that they were for the purpose of passing and that, if there was trouble with the train, it endeavored to reach the nearest passing tracks in order not to block traffic; that this use was incidental and a convenience and that they were not used generally for inspection and if used to inspect in case of trouble that such place was no more a place to work in the matter of inspection or repairs than was any other similar part of the railroad line.

This case, being under the Federal Employers' Liability Act, is governed by the Federal rule. *West-* ■ *ern and Atlantic R. R.* v. *Hughes,* 278 U. S. 496, 49 S. Ct. 231, 232, 73 L. Ed. 473, where it was held that this Federal rule, viz.:

"that it is the duty of the judge to direct the verdict, when the testimony and all inferences which the jury could justifiably draw therefrom would be insufficient to support a verdict for the other party"

must be applied by the state courts in cases arising under the Federal Employers' Liability Act, citing *Chicago, Milwaukee & St. Paul R. Co.* v. *Coogan,* 271 U. S. 472, 474, 46 S. Ct. 564, 70 L. Ed. 1041; *Gulf Mobile & Northern R. Co.* v. *Wells,* 275 U. S. 455, 457, 48 S. Ct. 151, 72 L. Ed. 370; *Toledo, St. Louis & Western R. Co.* v. *Allen,* 276 U. S. 165,

168, 48 S. Ct. 215, 72 L. Ed. 513. Ventura's testimony can hardly be construed to mean that inspections were customarily conducted at Chacra regardless of trouble or that that station was signalled out in case of trouble as the one passing track into which the train should customarily proceed in case of trouble, but, if it can be so construed, it must be disregarded as totally at variance with the justifiable inferences of other testimony and at variance with the testimony of what must necessarily be done in cases of emergency. The only justifiable inference from all the testimony is that where there is trouble which materially interfers with movement, the train must stop and adjustments or repairs be then made unless the train can make it to an available and adequate passing track which in this particular case happened to be Chacra.

The facts in the instant case are almost identical with those in the case of *Baltimore & Ohio R. Co.* v. *Berry*, 286 U. S. 272, 52 S. Ct. 510, 512, 76 L. Ed. 1098, where an experienced brakeman, familiar with the run on which he was injured, alighted in order to fix a hot box in the nighttime from a caboose where it had stopped on an unguarded and unlighted bridge or trestle so narrow as to afford no foothold to one getting off the train at that point. The negligence assigned in the Berry case was not that the bridge or part of the track was a place to work and was not reasonably safe but that the railroad was negligent in stopping the caboose on the trestle and in that the conductor directed or permitted the plaintiff to alight there. The Supreme Court held that there was no negligence in stopping the train where it was stopped and that there was no evidence that the conductor knew that the train had stopped there; that the brakeman's opportunity for knowledge was the same as the conductor's; that there was no evidence of a duty of the conductor to ascertain by inspection whether the brakeman could safely alight. We, therefore, do not think we can rest this case on the Berry case. The language of the Berry opinion

"If negligence caused the injury, it was exclusively that of the respondent [brakeman]",

would appear to cover the case of where a brakeman alighted without using his lantern (the situation in the Berry case) even at a place designated as one for work or by usage, custom or normal necessary operations made one in fact. But we are not prepared to hold that it went so far. The quoted language should, in resolving the doubt, be applied only to the facts of that case. Independently of the Berry case we have come to our conclusion that the passing track at Chacra is not a place to work as that term is used in the law of negligence relating to employer-employee relationship.

This conclusion is fortified by the recent case of *Kenney, Adm'x* v. *Boston & Maine R. R.,* 92 N. H. 495, 33 A. 2d 557, 560. The bridge in the Kenney case was in a territory between the working loci of the McElwain and Excelsior Sidings onto which cars were switched and spotted. There was no necessity in the switching operations revolving around the McElwain Siding to reach the territory on the south in which the bridge was located. Likewise, there was no necessity in the switching operations revolving around the Excelsior Siding to use that same territory on the north on which the bridge was located. The stop on the bridge on the dark night while the train was on the way from the McElwain to the Excelsior Siding was unexplained. Said the court:

"Considering the circumstance of the distance of the bridge from the two switches, there is not the slightest evidence that the defendant or any of its agents or employees should have anticipated that the deceased in the course of his duties would have occasion to alight upon the bridge. As far as appears, he had occasion to alight on the main track only at the switches and station. The test of the duty of the defendant to make the bridge safe as a workplace being anticipation * * * no duty in that respect can be found. The bridge was not a work-place in the sense that might perhaps have been found if the shifting operations were likely to result in a car standing on the bridge. * * *

"The deceased was not performing such work that the bridge was his contemplated work-place, findably required a rail for his protection.   *   *   *"

In the case at bar it appears that bridges on the line between Grand Junction and Mintern which are within 300 or 400 feet from switches have walkways for trainmen who leave the train to throw switches. Such areas where the work of throwing switches is contemplated correspond to the area in the Kenney case where switching was done in reference to the McElwain and Excelsior Sidings; the bridge at Chacra corresponds to the bridge between those sidings in the Kenney case. Furthermore, on the bridge at Chacra there was a walkway between the main and the passing tracks which was available to Pauly had he alighted on the north side instead of the south side of the train, a matter which will be more fully noted hereafter.

In *Yazoo & M. V. R. Co.* v. *Sudduth,* 171 Miss. 619, 157 So. 527, 528, decided before the 1939 Amendment of the Employers' Liability Act and relied on by the appellant, the facts were much like the case at bar but the negligence charged was not in failing to provide a safe place to work but, as in the Berry case, supra, in the engineer's failure to instruct Sudduth not to get off on the side without the walkway. Whether, had the negligence charged been failure to provide a safe place to work, there would have been a jury question as to whether the place of the emergency stop was a contemplated place of work in view of the fact that

"on account of the crossing of two lines, a good deal of switching and inter-change of cars is done there [at the unincorporated village of Harriston]",

although there was a safe place to alight on the east side of the bridge, was not, of course, decided in that case.

In *Davis* v. *Shirer,* 4 Cir., 288 F. 293, 296, also relied on by appellant, the court said:

"No standard of reasonable care requires a railroad so to construct its trestles that they can under all conditions be safely used by pedestrians when a train is standing on them or moving over them."

This case involved an emergency stop on a bridge not within any contemplated place to work.

Respondent relies on *Cawman* v. *Pennsylvania-Reading Seashore Lines*, 3 Cir., 1940, 110 F. 2d 832, 834. It is difficult to ascertain the basic facts of that case from the opinion nor is the negligence which was charged shown. The task of the court appeared to be one of distinguishing the case from the case of *Baltimore & Ohio R. Co.* v. *Berry*, supra. After cataloguing resemblances and differences between the Berry and the Cawman cases, the court proceeds to differentiate the cases on the ground that the theory of the Berry case was negligence of personnel whilst that of the Cawman case was "failure of material." If we are to infer that a "failure of material" was charged in respect to an omission to supply a walk and guardrail, we must further assume that under the facts of that case the jury could find that the place where the Pennsylvania train stopped was a contemplated place of work. Not so in this case. The mere fact both men injured in the Berry and Cawman cases had "frequent occasion to alight from the caboose platform of freight trains" would not justify the inference that every place at which they had occasion to alight was a place of work. In this respect respondent advances the proposition that had Ventura stepped from the rear of the caboose into a hole on the shoulder of the roadbed or on a piece of slag in the course of his duty as flagman and been injured it would present a jury question of whether his place of work had been kept reasonably safe. Assuming but not deciding for the purpose of the argument only that the strip along the roadbed behind any place on the railroad where the caboose stops is the contemplated place for the flagman to work because it is his duty to go back and granted further for such limited purpose that the flagman's stepping down without using his lantern to discover where he was stepping, is only contributory negli-

gence—thus still leaving the primary negligence of the company for the jury—it does not follow that as to a conductor who has the choice of place to alight and a choice of a course to take to the point of trouble, the entire shoulder of the roadbed must be kept safe not only for his foot travel but to catch him if he fails to investigate the point of his alightment.

We conclude that under the evidence the passing tracks at Chacra were not contemplated as a place for work but must be considered as one with all the rest of the road in the matter of making emergency adjustments or repairs; that using the passing tracks for such repairs was for convenience only in not holding up traffic and not because by custom, designation or contemplation a place of work; that for reasons more fully set out hereunder, under the evidence this was not a jury question.

2. *Was the absence of a walk on the south side of the bridge a defect or insufficiency due to negligence in "track, roadbed, or works" of defendant:* Even if it be assumed that a contrary result should have been reached on the question as to whether the jury should be permitted to determine whether the passing tracks at Chacra were a place to work, the plaintiff cannot prevail on his contention that the railroad failed to keep it safe. That issue has been raised and we deem it well to pass upon it. If it was within reasonable contemplation that the Chacra passing tracks would be used to make emeregency repairs and that constituted them for that reason a place of work for such repairs, was the appellant negligent in not providing a walk on the south side of its main track in view of the fact that there was a walk over the bridge between the tracks? In other words, in the phraseology of Sec. 51 of the Federal Employers' Liability Act, was the injury of Pauly due to the negligence of the carrier in permitting a defect or insufficiency in its roadbed or works (bridge) specifically an omission to furnish lights or a platform south of the main track?

When certain incidental and subservient questions are disposed of that question may be reframed in the light of our conclusions on such incidental questions.

The appellant contends that the evidence shows Pauly to have been (1) negligent as a matter of law and (2) such negligence was the sole cause of his injuries. We think the evidence conclusive that Pauly was negligent. Interpreting the evidence most favorably to him it appears that even if he did look or glance down—a matter in which his own testimony is contradictory—he saw only blackness and while he had a lantern and a lighted fusee in his left hand he did not use them to discover what was before him. It expressly appears from the evidence that he thought the caboose had passed over the bridge. That impression so controlled his mind that he acted on the impression—a very human thing to do but nevertheless not what a prudent man would have done. He gives as justification for his getting off on the south instead of the north side of the tracks where there was a platform the explanation that it was (1) customary to get off on the side where there was no track because it was safer; and (2) that passenger train No. 20 was passing over the passing track at that time, and (3) that the sparks from the stuck brake showed on the south side and prompted him in order to reach the trouble in the quickest possible time to get off on the south side.

We comment briefly on these three reasons in view of the evidence. That safety and the custom born of it should ordinarily make trainmen choose the clear ■ side rather than the passing track side is credible but safety rules are not ordinarily absolutes but must be applied according to the circumstances.

As to the passenger train passing at the time Pauly got off the front end of the caboose, this is in direct contradiction to the statements made in his deposition which was taken about six months after the accident and much nearer to it than the trial. At that time he testified that he left his place near the front of the caboose, went to the rear platform of the caboose and that No. 20 was then just

coming up the pass; that he then checked the engine and equipment on No. 20 as was his duty and then, after it passed, went inside, put on his overcoat, got his lantern and fusee and stepped to the front platform of the caboose and off into space. Certainly under that testimony No. 20 would have passed when he got to the front platform. It consisted of the engine, tender, baggage car, mail car, coach and sleeper. He had to remain on the caboose until it passed in order to check equipment. At the speed it was going— 8 to 10 miles an hour—the engine and four cars would have passed before he went in to get his coat. At the trial he stated he had read his deposition and concluded that such testimony was wrong and that he had his coat, his hat and overcoat and went to the rear platform and then to the front platform where he checked No. 20 before he alighted. He gives no adequate explanation of how he came to testify as he did in the deposition where he gave in detail all his movements nor what it was that made him

"reconstruct * * * the events and particulars of the occasion when he got injured"

except that his thoughts on the matter refreshed his recollection. This is not the case where a witness testified in such terms or phrases as give room for an explanation of what he intended to convey by them. He testified in his deposition as to his positive actions and whereabouts in detail and in sequence when that testimony was closer to the events. Nor is it a case where the sequence of events or of dates or times may be all based on an event or time in regard to which, if a mistake were made, would shift the whole sequence or calendar of events. This is a reconstruction of the sequence of details arrived at after he had read the deposition and evidently in the light of a recognition that it would offer a fair explanation of his choosing the south rather than the north or platform side to alight. We think it questionable whether he is not concluded by the testimony of his deposition in that respect. But at all events even if he checked No. 20 from the front platform of the caboose just

before he alighted it must have passed before he alighted because he had to remain until it was past to count the equipment. We think that the jury would necessarily have had to conclude from the evidence that No. 20 had passed or was so near past at the time he finished checking that it was no longer a danger to his getting off on the north side of the caboose. At least he could have waited a moment until it passed.

As to the sticking brake being on the south side, the evidence is that ordinarily where one brake on the wheel truck sticks they all do and that the smoke emitted because of the heat generated may be discerned from either side. But, as before stated, the evidence is clear that Pauly was motivated to step down from the south side fundamentally because his mind was controlled by the impression that the caboose had passed the bridge and that it need not be taken any more into consideration. That being so he naturally followed his habit of stepping off on the side away from parallel tracks. And doubtless his seeing the sparks on that side may have entered into the decision. But when all that is said it remains an inescapable fact that he was palpably negligent in stepping down without ascertaining what was below him. A moment of directing the light of the lantern or fusee down would have pierced the darkness to reveal the bridge. When he glanced down, if indeed he did glance down, he saw only darkness. That should have warned him to use his lighted lantern. The evidence shows its light was quite powerful and also that the light of the fusee if held so as not to blind him would have disclosed the perils of the bridge. But if he looked he did not see and knowing that he did not see he lets himself go from a safe place into space. Gravity operates on him and carries him past the edge of the bridge to the creek bed. The jury found he was negligent and his counsel spent no time in denying it. They contend that the jury under Sec. 53 of the Act may diminish total damages in proportion to the amount of negligence attributable to the respondent.

The respondent must of course prove negligence on the part of the appellant in order to recover under the Act. This is basic. See cases under note 557, 45 U. S. C. A. § 51. The plaintiff charges the railroad with negligence in failing to provide a safe place to work but in view of the negligence of the plaintiff the charge really amounts to a failure of an alleged duty to place a platform so as to intercept the hapless course of the plaintiff started entirely by his own negligence.

Fortunately through the 1939 Amendment to the Federal Employers' Liability Act the cruel doctrine that the employer's negligence, if known to the employee, was assumed, has, it is hoped, been forever abolished in the railroad industry. By the Amendment the assumption of risk doctrine has been completely abrogated. As noted by Mr. Justice Frankfurter in his concurring opinion in the case of *Tiller* v. *Atlantic Coast Line R. Co.*, 318 U. S. 54, 69, 63 S. Ct. 444, 87 L. Ed. 610, 143 A. L. R. 967, many cases even before the amendment were wrongly withheld from the jury or decided by juries under wrong instructions because of a pseudo assumption of risk doctrine. The distinction pointed out by Mr. Justice Frankfurter was clearly recognized as early as 1862 in the case of *Ryan* v. *Fowler*, 24 N. Y. 410, 82 Am. Dec. 315. It is to be hoped that in industry generally this differentiation between a workman having assumed the risks of his employer's negligence by continuing in the employment after he has notice of the danger, and the assumption of risks inherent in the industry difficult or impossible to eliminate, will be noted by the courts and given its former one time place in the law. Thus we are not any more concerned with the assumption of risk doctrine whether the risk was inherent in the industry or due to the negligence of the railroad. Whether the railroad is liable for injuries depends entirely on whether it was negligent and whether that negligence caused or contributed to the injury.

This is not a case where the plaintiff's and defendants' negligence converge to initiate the journey of mishap; nor

the case where the railroad maintains a trap like an unblocked frog into which the workmen's foot except with the greatest of care may become wedged, *Spencer* v. *New York Cent. & H. R. R. Co.*, 67 Hun, N. Y., 196, 22 N. Y. S. 100, nor the case of a hole or a protuberance in the pathway, which is the employee's place of work, likely to cause unbalance, *Southern Pac. Co.* v. *Seley*, 152 U. S. 145, 14 S. Ct. 530, 38 L. Ed. 391; *Delware, L. & W. R. Co.* v. *Koske*, 279 U. S. 7, 11, 49 S. Ct. 202, 73 L. Ed. 578; *Chicago, R. I. & P. R. Co.* v. *Lonergan*, 118 Ill. 41, 7 N. E. 55; *Southern R. Co.* v. *Newton's Adm'r*, 108 Va. 114, 60 S. E. 625; *Chicago Great West. Ry. Co.* v. *Peeler,* supra; *Haskins* v. *Southern Pac. Co.*, supra; *Melody* v. *Des Moines Union Railway Co.*, supra; nor the case of the railroad carrying a trainman in the course of his duty on top of a car toward a low bridge without a tell-tale to warn him of the danger into which he is being carried. *Choctow, Oklahoma & G. R. Co.* v. *McDade*, 191 U. S. 64, 67, 24 S. Ct. 24, 48 L. Ed. 96; *Baltimore & Ohio & Chicago R. Co.* v. *Rowan*, 104 Ind. 88, 3 N. E. 627; *Atchison, T. & S. F. R. Co.* v. *Rowan*, 55 Kan. 270, 39 P. 1010; Sherman & Redfield, Negligence, Sec. 210, p. 507 and Notes.

The books are replete with cases where a dangerous condition maintained has trapped a workman because in the intentness on his work he did not keep the danger sufficiently in his consciousness. Often moving into unguarded machinery may be avoided only by such alertness as would be more than could normally be expected even from the prudent man in his work movements. Often the intentness required for a job precludes that alertness needed to avoid injury in places of danger and if maintained would interfere with the efficiency of that work.

Certainly where the danger is one which lies in wait for the workman, likely to be a trap or to be encountered incidental to or in the very motion of his ordinary work movements or where the condition is such that, either by concurring with his negligence or without negligence on his part, projects or transports him into

danger, and where it was reasonably foreseeable that such condition might cause harm although just how or by what means or to what extent the harmful results would ensue may not have been apprehended, a question of the carrier's negligence is presented. But here the mishap was initiated entirely by the negligence of the respondent not assisted nor contributed to by the appellant. There was no jerk which dislodged him, no converging of a dynamic negligence— negligence in action—of the appellant contemporaneous with respondent's negligence or preceding it which induced, activated, furthered or gave rise to his negligent act; nor was there any static negligence—a negligent condition—created or permitted by the appellant which induced, invited or caused the negligent act of the respondent; nor was there after the initiation of a negligent act by respondent any successive act or action of appellant which turned the course of respondent into a dangerous channel or aggravated, concurred in or added to the predicament in which his sole act had placed him; nor was there any dangerous condition created by the appellant lying in wait for respondent into which his negligence precipitated him or which diverted or projected him from a course which might otherwise have been uneventful or which added to or aggravated the dangerous plight which his negligence solely started. The respondent, under the spell of the impression that he was across the bridge; intentionally left a position which was safe without taking proper precautions to ascertain the nature of the footing below him and dropped into space, starting himself on the career of disaster. The negligence he ascribes to the appellant is the omission of lights which might have warned him not to commit the folly and a platform which would have intercepted him after he had started himself on his hapless course. The test of whether appellant in such case was guilty of a negligence of omission is whether it could be reasonably anticipated that Pauly would drop off in the dark without using the means furnished him—in this case a lantern carried with him—to discover the nature of the terrain under him,

when there was a walk on the other side safe to alight upon and in the face of a rule which instructed him that:

"Before getting on or off equipment, employees must look for a safe footing."

We note in passing the contention of appellant that plaintiff's violation of Safety Rule No. 3 that requires employees to look for safe footing before getting on or off equipment was the sole cause of the accident. It should be observed that this rule was not one to safeguard traffic as in the case of *Davis* v. *Kennedy*, 266 U. S. 147, 45 S. Ct. 33, 69 L. Ed. 212; *Unadilla Valley R. Co.* v. *Caldine*, 278 U. S. 139, 49 S. Ct. 91, 73 L. Ed. 224; *Southern R. Co.* v. *Youngblood*, 286 U. S. 313, 52 S. Ct. 518, 76 L. Ed. 1124. It was a cautionary rule for the safety of the employee. It simply put in rule form a precaution which common sense would without the rule have prescribed as proper care on the part of a prudent man. See *Norfolk & W. R. Co.* v. *Riggs*, 6 Cir., 98 F. 2d 612; a violation of this rule therefore rises no higher than a lack of due care and not as appellant contends a violation of a rule designed to prevent traffic accidents which violation was itself the cause of the accident such as in the three cases first cited.

Ordinarily there would be no occasion to get off for the purposes of throwing switches at the Chacra passing track because they were controlled by a central traffic control station. Only in case where trouble occurred on such place on the line as to permit the train to pull into the passing track at Chacra would there be any need of the conductor alighting. The chance of the caboose stopping on this bridge would depend on where the train stopped and its length. It is obvious that the chances that it would be stopped there as against some other place between the switches of the Chacra passing were small. The chances that if it was so stopped on this bridge the conductor would get off or if he did that it would be on the south side of the main track and that he would not at night investigate before he alighted were so remote as to make

such mishap only a possibility and not a probability. The employer need not guard against the mere possibility that an employee may start himself solely by his own act on a course of mishap, and make the premises safe against such possibility even granted it is a place to work. In the oft quoted passage by Sir Frederick Pollock:

"If men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behaviour we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things."

The defendant could not reasonably have anticipated that the plaintiff would expose himself to a danger which the most ordinary foresight exerciseable when he was in a position of safety with ample time and deliberation to exercise that foresight would have avoided. *Fort Smith Gas Co.* v. *Cloud,* 8 Cir., 75 F. 2d 413, 97 A. L. R. 833; *Main Island Creek Coal Co.* v. *Chesapeake & O. R. Co.,* 6 Cir., 23 F. 2d 248; *Davis* v. *Schroeder,* 8 Cir., 291 F. 47.

The railroad is obliged to furnish not an absolutely safe place for the employee to work but one reasonably safe. This rule does not mean that it must remove all possible danger, but all such danger as it can remove or guard against by the exercise of reasonable care. *Patton* v. *Texas & P. R. Co.,* 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361. *Union Pacific R. Co.* v. *O'Brien,* 161 U. S. 451, 16 S. Ct. 618, 40 L. Ed. 766. *Cincinnati N. O. & T. P. R. Co.* v. *Zachary's Adm'r, Ky.,* supra; *Melody* v. *Railway Co.* supra; *St. Louis & San Francisco Railway Co.* v. *Weaver,* 35 Kan. 412, 11 P. 408, 57 Am. Rep. 176; *Nutt* v. *Southern Pacific Co.,* 25 Ore. 291, 35 P. 653; *Atchison T. & S. F. R. R. Co.* v. *Wagner,* 33 Kan. 660, 7 P. 204; *Gulf, C. & S. F. Ry. Co.* v. *Wells,* 81 Tex. 685, 17 S. W. 511; also *Chicago & A. R. Co.* v. *Kerr,* 148 Ill. 605, 35 N. E. 1117.

The appellant contends that the negligence of the plaintiff was the sole cause of his injuries. This necessarily involves the question as to whether the appellant was itself guilty of negligence which concurred in producing the accident. If the appellant had a duty to construct a platform on the bridge on the south side of the main line in order to intercept the drop of the respondent or, put in another way, to make it safe for him to get off regardless of his care or lack of care, then failure to do so was negligence which negligence, since it failed to preserve the respondent safe from his own lack of care, was a concurring cause of the accident and his negligence was not the sole cause. If, on the other hand, the appellant did not owe such duty, it was not negligent in not so constructing the platform and there being no negligence which concurred in or contributed to the respondent's negligence, his negligence was the sole proximate cause. Thus we are referred back to the fundamental question under consideration, viz., whether the appellant owed any duty to the plaintiff under the circumstances in this case. That involves an application of the time worn principle as to whether the defendant as a prudent person could or should have reasonably anticipated that (1) a caboose would stop on the bridge and (2) that the conductor in the caboose would step off without looking, or, if he looked, would, in seeing nothing but darkness, not use his lantern to reveal the situation under him especially when there was a platform on the north side of the main track on which he could have alighted. And this is all on the assumption that the passing track was a place to work. If it is not a place to work—which we have already determined that it is not—a prudent person would certainly not have been under obligation to have anticipated such result. Certainly a prudent railroad could have anticipated that a caboose might be stopped on the bridge. But it could also anticipate that the times it would stop on the bridge would be few compared to the times it would stop off the bridge. But that when it did happen to stop on the bridge that the conductor or other employee would drop down in disregard of ascer-

taining what was under him when there was a platform on the other side, would be only a remote and only a possible risk which a prudent person would not consider need be guarded against. A neglect to do so cannot be considered negligence. An omission to guard the plaintiff against such contingencies would not have caused or contributed to his accident, or put another way, the plaintiff's accident would seem to be the sole result of his negligence and not a contributed result of the lack of a platform to stop him. It seems somewhat a confusion of concepts to say that the injurious result of the plaintiff's carelessly dropping himself into space was due to the defendant's omission to stop him when he did so. ·

3. *Are questions one and two above jury questions*: Being mindful of what is said on page 463, 10th Ed. 14-16 of Pollock on Torts, that

"the tendency of modern rulings of Courts of Appeal has been, if not to enlarge the province of the jury, to arrest the process of curtailing it",

and also the fact that too often in the past courts have taken it upon themselves to decide that railroads were not in law negligent when the question of due care was one for the jury, we have concluded that under the evidence neither of the above questions are for the jury.

In the concurring opinion in the recent case of *Hess* v. *Robinson et al.*, 109 Utah 60, 163 P. 2d 510, there are set out excerpts from the Restatement of the Law of Torts and from Pollock on Torts, 10th Ed., as to when the question of negligence is for the jury and when for the court. Reference is made to that opinion for such excerpts. There is no dispute that a line between the functions exists. The difficulty arises in determining where the line is to be drawn in varying fact situations.

Certainly reasonable minds could not differ as to the fact that Pauly was negligent and that his negligence alone started him on the course which ended so disastrously for him. The remaining question is whether under the evidence

of this case the jury should be allowed to pass on the question as to whether there was a defect or insufficiency in the roadbed of the carrier *due to its negligence* through or by reason of which plaintiff's injuries were caused or contributed to. We have above concluded that as a matter of law the railroad, as a prudent person, was not exposing Pauly to an unreasonable risk by not placing lights or a platform on the bridge or by not placing a platform on the south side so that he might alight on that side of the bridge without harm when he did not have to alight on the bridge at all or might have done so safely if he had dropped down on the north side of the main track; hence, the railroad was in law not under a duty to anticipate that he would so act to his detriment and to save him from the consequences of his act. The railroad was not under duty to guard against all possible risks or dangers especially when the possibility of harm arose only when the employee was lodged in a safe place and not in motion and by his own lack of care took himself out of such position due to a false impression and projected himself on the course which unintercepted could only result in injury. There was no risk in this case until Pauly let go the hand holds. We do not think there could be any reasonable difference of opinion that no such duty existed on the part of the carrier whether the passing tracks at Chacra be considered as a place of work or not. We do not think there could be any reasonable difference of opinion that the railroad acted with due foresight or that there was no "omission" to do something which a reasonable man, guided upon those considerations which ordinarily regulate the conduct of human affairs, could do, or the doing of something which a prudent and reasonable man would not do. The railroad could anticipate that if an employee dropped off on the south side of the bridge without looking or on a dark night without making sufficient investigation, the natural and probable consequence would be that he would drop to the bed of the creek, but it need not anticipate that he would commit such palpable negligence and that it must therefore construct its bridge so as to save him from the

effects of such negligence. If it was under duty to anticipate that he would so act negligently then it is under duty to foresee almost any possible negligence on his part and to take any practicable precaution to prevent the consequence of such unexpected and unlikely negligence. To the argument that it is a jury question if there can be a reasonable difference of opinion as to the duty of the railroad to guard against the consequences of such an eventuality as in this case occurred, the answer is that we do not think there would be such difference of reasonable opinion. That, in the last analysis, must rest on the judgment of the trial court subject to review as to whether in that regard his judgment was correct.

Said Lord Cairns in *Metropolitan Railway Co.* v. *Jackson,* 3 App. Cases 193, 197; 47 L. J. C. P. 303:

"The judge has a certain duty to discharge, and the jurors have another and a different duty. The judge has to say whether any facts have been established by evidence from which negligence *may be* reasonably inferred, the jurors have to say whether, from those facts, when submitted to them, negligence *ought to be* inferred. It is, in my opinion, of the greatest importance in the administration of justice that these separate functions should be maintained, and should be maintained distinct. It would be a serious inroad on the province of a jury, if, in a case where there are facts from which negligence may reasonably be inferred, the judge were to withdraw the case from the jury upon the ground that, in his opinion, negligence ought not to be inferred; and it would, on the other hand, place in the hands of the jurors a power which might be exercised in the most arbitrary manner, if they were at liberty to hold that negligence might be inferred from any state of facts whatever."

And Lord Blackburn in the same case at page 207:

"On a trial by jury it is, I conceive, undoubted that the facts are for the jury, and the law for the judge. It is not, however, in many cases practicable completely to sever the law from the facts.

"* * * It is for the jury to say whether and how far the evidence is to be believed. And if the facts, as to which evidence is given, are such that from them a further inference of fact may legitimately be drawn, it is for the jury to say whether that inference is to be drawn or not. But it is for the judge to determine, subject to review, as a

matter of law whether from those facts that further inference may legitimately be drawn."

And Lord Gordon in the same case at pages 210, 211:

"The duty of a Judge in such a case is an exceedingly delicate one, as the line of division between what is proper to be submitted to the jury, as necessary to support a charge of negligence in point of law, and what may be submitted to the jury as sufficient to support a charge of negligence in point of fact, is often a very narrow one. But I agree in what was said by Mr. Justice Willes, in the case of *Ryder* v. *Wombwell* (Law Rep., 4 Ex. 32 at p. 38) which has been quoted by Lord Blackburn, that 'there is in every case a preliminary question, which is one of law, namely, whether there is any evidence on which the jury could properly find the question for the party on whom the onus of proof lies. If there is not, the Judge ought to withdraw the question from the jury, and direct a nonsuit if the onus is on the Plaintiff, or direct a verdict for the Plaintiff if the onus is on the Defendant.'

\* \* \* \* \* \*

"\* \* \* I concur with your Lordship on the woolsack in thinking that it is impossible to lay down any rule, except that from any given state of facts the Judge must say whether negligence can be legitimately inferred, and if the Judge is of that opinion, then it is for the jury to say whether it ought to be inferred." See also *Union Pacific Railway Co.* v. *McDonald*, 152 U. S. 262, 14 S. Ct. 619, 38 L. Ed. 434.

The obligation to determine whether minds could reasonably differ as to whether under the evidence a prudent person would have acted differently is always with the court. If he is in doubt he should put it to the jury. If he has no doubt that all reasonable men must conclude that ■ the defendant met the legal standard of care, that is, that he did what a prudent person would have done under the circumstances or the thing he omitted to do is what a prudent person could under the circumstances have omitted, he must withdraw the case from the jury. Otherwise, *all* cases must go to the jury. It would alone be the ultimate arbitrator under *all* circumstances of what was prudent conduct or the lack of it. While the law may be tending in this direction it has not reached that point. We think that this is one of those rare cases where the

"permissible inferences [from the facts] are so certain that reasonable men, in the exercise of a fair and impartial judgment, must agree upon and draw the same conclusion". *Bimberg* v. *Northern Pac. R. Co.*, supra [217 Minn. 187, 14 N. W. 2d 411].

To conclude: We have no doubt in this case that the appellant is not guilty of negligence in relation to the respondent in failing to place lights on the bridge nor in placing a platform on the south side of the main tracks on the bridge. We think the case should have been withdrawn from the jury. It thus becomes unnecessary to consider the other questions in the case. The judgment is reversed with instructions to dismiss. Costs to appellant.

LARSON, C. J., and McDONOUGH, J., concur.

TURNER, Justice.

I dissent. I am of the opinion that the complaint states a cause of action, and if the evidence supports the allegations therein contained, the plaintiff is entitled to a judgment.

This case was tried with a jury sitting to determine the facts. The prevailing opinion holds that there was not sufficient evidence to go to the jury as to the place where Harry O. Pauly was working when injured being a place to work, under the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq.

Mr. Justice Wolfe has described the railroad tracks at Chacra, Colorado. The passing tracks are approximately 6000 feet in length. They are situated at a very favorable place, where clear vision can be had from one end of the passing tracks to the other.

The opinion recites, that Pauly had been crossing over the bridge for several years. He knew the ground. He had walked across the bridge from which he fell or which he missed, at least 50 times and at least on ten occasions he had gone over the bridge at night. Ventura, the brakeman on the train testified as to the use the passing tracks were put to.

At the time of the accident the train Pauly was in charge of was traveling west. It remained on the main tracks at Chacra while trains coming from the west could pass by using the side or passing tracks. The Pauly train had stopped to repair a hot box. Both the conductor and brakeman knew the need for stopping. The hot box had also been seen by the engine crew.

Mr. Justice Wolfe makes this conclusion:

"If the passing track at Chacra is a place to work then every other passing track on the road is by the same token a place to work" and then later says, "The whole main line would then have to be considered as a place to work."

If I thought it were my prerogative to pass upon the evidence and I could reach the same conclusion as Mr. Justice Wolfe there would be no need of this dissent. However, I think Mr. Justice Wolfe, from the facts revealed by him in his opinion, is not justified in drawing such conclusions.

I believe that the case presented a jury question and that the trial court properly submitted the matter. This conclusion is supported in a recent case, *Bly* v. *Southern R. Co.*, 183 Va. 162, 31 S. E. 2d 564.

This case is very similar to the case at bar and supports this dissent both as to the necessity of submitting the case to the jury and finding that an accident which occurred under quite similar circumstances happened at "a place of work". I recommend that all interested read this opinion, part of the syllabus of which is as follows:

"4. An unsafe place to work provided by master for the servant is a violation of one of the non-assignable duties of the master, and amounts to negligence.

"5. Generally, negligence is a jury question where there is a conflict in evidence with relation to existence of facts from which negligence may be inferred, and where there is room for difference of opinion between reasonable men as to the inferences which might fairly be drawn from conceded facts."

See also *Chicago Great Western R. Co.* v. *Peeler,* 8 Cir., 140 F. 2d 865. I quote from the syllabus:

"1. In determining sufficiency of evidence on appeal, where jury found for plaintiff after motion for a directed verdict was overruled, the court was bound to resolve all conflicts in the evidence against defendant and plaintiff was entitled to the benefits of such favorable inferences as the jury might reasonably have drawn therefrom."

"5. In action under Federal Employers' Liability Act, jury could believe testimony of plaintiff though it was directly contradicted by testimony of defendant's witness."

The case cited supra is used by Mr. Justice Wolfe in his opinion but it does not support his contentions but is authority to the contrary. I also call attention to a recent decision from the United States Supreme Court, *Bailey, Adm'r* v. *Central Vermont Railway*, 319 U. S. 350, 63 S. Ct. 1062, 87 L. Ed. 1444, decided May 24, 1943. In this case the court held the question of facts was one for the jury and also upheld the original trial court's verdict based upon a finding that the injured workman was hurt when employed at "a place of work".

The case of *Haskins* v. *Southern Pacific Co.*, 3 Cal. App. 2d 177, 39 P. 2d 895, is similar to the one at bar in many respects. The person injured alighted from the train he was working on at a station or siding called Numana, Nevada. There were passing tracks, a station, and a place to unload freight. The brakeman was off the train between the tracks for the purpose of looking for hot boxes. This case supports the contention that the problem of fact is a jury question, and, I feel, supports the case at bar in other respects.

Feeling that the factual conclusions in the prevailing opinion are not warranted and that the court has failed to give these more recent cases proper weight and application, I feel the necessity of this dissent.

WADE, Justice.

I dissent. I believe there was sufficient evidence to go to the jury on the question of whether the place where the accident happened was a "place of work" and the court did not err in so submitting it. There was evidence that when trouble developed on a train it was customary to bring it

onto the passing track, if possible, before inspection and repairs were made. It was the duty of the conductor to alight when the train stopped under such circumstances and inspect the trouble. There was also evidence that when employees had to alight at the passing track in Chacra, Colorado, that they considered it more safe to alight on the side away from the track so as to avoid danger from passing trains.